STRUEBING, Respondent, vs. AMERICAN INSURANCE COM-
PANY, Appellant.

*October 10, 1928—January 8, 1929.*

488

490

For the appellant there were briefs by *Tenney, Reynolds & Davis* of Madison, and oral argument by *E. J. Reynolds*. *T. L. Doyle* of Fond du Lac, for the respondent.

DOERFLER, J.   The policy in the defendant company was a Wisconsin standard fire insurance policy and contained the following provision, to wit:

"Unless provided by agreement in writing, added hereto, this company shall not be liable for loss or damage occurring (a) while the insured shall have any other contract of insurance, whether valid or not, on the property covered in whole or in part by this policy."

There was no agreement in writing added to the policy authorizing any other contract of insurance on the property covered in whole or in part by the policy in the defendant company, and the court so found.

The court also found that on March 26, 1926, the plaintiff procured another policy of insurance from the Theresa Company, covering personal property on the premises covered by defendant's policy.   This would suspend the liability in the policy of the defendant unless, pursuant to an agreement in writing added to the policy, the defendant company had authorized another contract of insurance, on the ground that the policy in question was entire and indivisible.   *Hinman v. Hartford Fire Ins. Co.* 36 Wis. 159; *Schumitsch v. American Ins. Co.* 48 Wis. 26, 3 N. W. 595; *Dohlantry v. Blue Mounds F. & L. Ins. Co.* 83 Wis. 181, 53 N. W. 448; *Worachek v. New Denmark Mut. Home F. Ins. Co.* 102 Wis. 81, 78 N. W. 165; *Burr v. German Ins. Co.* 84 Wis. 76, 54 N. W. 22; *Carey v. German American Ins. Co.* 84

Wis. 80, 54 N. W. 18; *Bloomer v. Cicero Mut. F. Ins. Co.* 183 Wis. 407, 198 N. W. 287.

Sec. 209.06 (2) of the Statutes provides:

"(2) No warranty incorporated in a contract of insurance relating to any fact prior to a loss shall defeat or avoid such policy . . . unless such breach existed at the time of the loss."

Plaintiff's counsel insists that the section of the statutes above quoted controls this case; that the policy provision above set forth constitutes a warranty under such section; that inasmuch as the plaintiff at the time of the loss was in default in the payment of the assessment levied by the Theresa Company, which default continued for a period of four months prior to the loss, the policy in the Theresa Company became absolutely void, to the same effect as though no policy whatever had ever been procured in such company. This attitude of plaintiff's counsel also meets with the approval of the trial court in its opinion filed.

In 2 Clement on Fire Insurance, p. 36, the term "warranty" is defined as follows:

"A warranty in an insurance contract is a statement made therein by the assured which is susceptible of no construction other than that the parties mutually intended that the policy should not be binding unless such statement be literally true."

The definition of the author above quoted refers expressly to a *statement* which must be *literally true* to entitle the insured to recover a loss under the policy. Bearing in mind the quoted provision of the policy, which plaintiff's counsel and the trial court denominate a warranty, an examination of the language used does not reveal a *statement* which must be *literally true* to entitle the insured to recover. The policy provision above quoted points out what is necessary to authorize other contracts of insurance. It requires an agreement in writing added to the policy. It further declares that

the procuring of another contract of insurance in violation of this policy provision shall relieve the company from liability for loss or damage, whether the contract for other insurance be valid or not.

Defendant's counsel argue that the language of the policy quoted is clear and unambiguous; that the legislature when it adopted the standard form of fire insurance policy, in which is included the provision of the policy heretofore quoted, had the accomplishment of definite and distinct purposes in view; that it intended to create and did create a public policy, directed against over-insurance, and thus to remove from insurers the temptation of incendiarism. Furthermore, that it proposed to relieve the company from the burden of proving the validity of such other insurance, and that this purpose is clearly made manifest in the use of the language contained in the policy provision, "whether valid or not."

Official statistics conclusively demonstrate that the amount of property which is annually destroyed in this country, and which can be traced directly to over-insurance and the temptations to incendiarism, is appalling. According to political economists, the welfare and prosperity of a nation depend largely upon the existing wealth of the country. It therefore follows that the destruction of such wealth affects the material welfare and prosperity of the inhabitants; but while material destruction may result in disastrous consequences from an economic standpoint, the incentive to criminality, which is directly stimulated by over-insurance and the temptations connected therewith, has a tendency to undermine the entire system of government. We are therefore convinced that the legislature, when it adopted the standard form of policy containing the language therein above quoted, created a definite public policy, with the view of conserving not only the wealth and resources of the state, but of elevating the moral standard of its inhabitants; that

in employing the language used, "whether valid or not," it realized, among other things, that an insured who has contracted for additional insurance in violation of the provisions of the policy may be effectually tempted to commit fraud while laboring under the false belief that the additional insurance is valid. The legislative records also disclose that the standard form of policy was unanimously adopted by the members of the, legislature of 1917 at the instigation of the then insurance commissioner, who was an official of the state charged with the public duty of protecting the interests of the state and its citizens; and that such enactment was in harmony with an existing scheme throughout the nation, in the interests of uniform legislation on the subject of insurance, which found support in the advanced and progressive thought of insurance experts everywhere. This is demonstrated also by the great number of states in this country which have adopted a standard form of policy like our own. This standard form of policy, in so far as it controls additional insurance contracts, has been construed by many courts of last resort, including our own, as will appear from quotations of opinions and authorities hereinafter set forth and referred to.

We must not omit to emphasize that one of the principal objects of this legislation is intended to create a situation in which the insured shall bear a part of the risk, in order to stimulate care and diligence in the protection of property.

In the case of *Phœnix Ins. Co. v. Copeland,* 90 Ala. 386, 8 South. 48, the following pertinent and persuasive language is used in the opinion:.

"One manifest purpose is, by compelling the insured to bear a part of the risk, to remove temptation to destroy his own property and to afford a stimulus to exercise care and diligence in its protection, which purpose is defeated, though the other insurance may be invalid, if the insured believes it to be valid, as he must do, otherwise he would not expend money in procuring it. Another purpose is to relieve the company of the burden of proving the validity of such other

insurance by having to show the consent of the company, or a waiver of the forfeiture or otherwise. Again, it is sufficient reason that the parties competent to fix the terms of their contract have so contracted. Such condition is not violative of any rule of law or public policy. A construction that only valid and enforceable insurance comes within the scope of the condition disregards the plain import of the contract and the objects which the parties intended to accomplish, and devolves on the court the inconvenience and burden of trying collateral issues involving the validity of a contract other than the one sued on."

In the case of *Donogh v. Farmers' Fire Ins. Co.* 104 Mich. 503, 62 N. W. 721, it is said:

"Language could not well be more specific. The evident purpose of the provision is to guard against the possibility of all apparent motive or inducement to commit fraud. This cannot be wholly guarded against by providing that the assured shall not have any enforceable contract, but it was deemed wise to provide against the taking out of any policy which the insured might deem a protection and regard as affording him indemnity. The purpose is apparent, and is lawful; and the language is intended to be broad enough to cover every possible case in which motive to incendiarism might be created by over-insurance, or by a belief on the part of the insured that he had succeeded in procuring excessive insurance. In reason and by authority, the policy is rendered void by a subsequent insurance in form, even though such insurance may not be binding and enforceable."

See, also, *Gnat v. Westchester Fire Ins. Co.* 167 Wis. 274, 167 N. W. 250; *Continental Ins. Co. v. Hulman*, 92 Ill. 145; *Phenix Ins. Co. v. Lamar*, 106 Ind. 513, 7 N. E. 241; 2 Clement, Fire Insurance, p. 104.

The procuring of the additional insurance in the Theresa Company did not result in voiding the policy in the defendant company, but had the effect of *suspending* the latter company's liability. This is manifest from the language used in the provision contained in the policy issued by the defendant, which reads as follows: "Unless otherwise provided by agreement in writing added hereto, this company shall

not be liable for loss or damage occurring (a) *while* the insured shall have any other contract of insurance," etc. It was so expressly held by this court in the case of *Blue Mound F. S. Co. v. Farmers' Mut. Fire Ins. Co.* 195 Wis. 615, 219 N. W. 357, where it is said:

"The doctrine with respect to suspension of a policy, as stated by Cooley and fortified by authorities, appears to be in accordance with the tendency of modern judicial decisions. It is also in accordance with the provisions of the standard fire insurance policy of the state, which establishes the public policy of the state generally."

See, also, *Fireman's Fund Ins. Co. v. Jackson,* 161 Ga. 559, 131 S. E. 359, where it is said:

"The word 'while,' used in this connection, does not mean that on failure to pay the instalment the policy became *absolutely void.* The word, rather, has the meaning of 'pending' or 'during the time;' that is, that 'pending the time,' or 'during' the time the instalment note remains unpaid, the policy was unenforceable, and when the instalment note was paid the primary status was restored. Webster's New International Dictionary defines the word 'while' as meaning 'during the time that; as long as,' etc."

We now come to the claim made by plaintiff's counsel to the effect that inasmuch as the plaintiff failed to pay the assessment levied by the Theresa Company at the time of the loss (the loss being four months after the time of the levy of the assessment), the policy in the Theresa Company became absolutely void, with the effect that at the time of the loss the insurance in the latter company was no longer in existence. In other words, it is claimed that the suspension of liability of the defendant company was automatically removed.

In the year 1911 the Theresa Company passed a resolution as follows:

"It was moved and carried that any member of our insurance company not paying his assessment within sixty days

after receiving his assessment card shall forfeit and lose his right of insurance in this company."

At the time of the adoption of the foregoing resolution and for some time prior thereto, the statute now known as sec. 202.11 (3) had been enacted, and said section provides:

"Every member who shall neglect or refuse to pay such assessment at the time specified in the notice sent to him, shall pay to such corporation a fine of two per cent. of the amount of such assessment for each week or part thereof during which the same shall remain unpaid, and no payment shall be made by any company upon the policy, of any member, hereafter written, who shall sustain a loss, if such member, at the time of such loss, shall be in default and shall have neglected or refused to pay such assessment at the expiration of thirty days from the time specified in said notice sent to him."

More than sixty days had elapsed after the insured had received his assessment card. The insured was therefore in default, and such default, under the express language of both the statute and the resolution, would relieve the Mutual Company from liability in the event of a loss occurring during such period. When the loss occurred, however, the insured still held his certificate in the Mutual Company. He still continued to be a member of such company, under the express language contained in the statute, which governs and regulates mutual fire insurance companies like the Theresa Company. By the express language of the statute, a method of reinstatement of the certificate was still open and available to the insured. This is rather persuasive that the policy in the Mutual Company, after the default occurred and at least up to the time of the loss, was subject to reinstatement upon conditions. The policy was therefore not dead, but was suspended.

That the fire was accidental in its origin is conceded on all sides, and the insured, therefore, up to the very occurrence of the fire, may have labored under the impression that both

the policies in the defendant company and in the Mutual Company were in full force, inspiring the belief that these policies would cover his loss to the extent of the apparent insurance. A situation was therefore created, first, of the existence of a possible over-insurance, and second, of the production of an incentive for incendiarism, all of which the legislature intended to guard against by including in the standard form of policy a provision which reads:

"Unless otherwise provided by agreement in writing added hereto, this company shall not be liable for loss or damage occurring (a) while the insured shall have any other contract of insurance, *whether valid or not,* on the property covered in whole or in part by this policy." (Italics ours.)

This provision contained in the standard form of policy, in fact the entire standard form of policy, results by virtue of the provisions of the statute enacted in 1917, and such enactment is subsequent to the enactment of sec. 209.06 (2) of the Statutes, all with the result that, if the two statutory provisions conflict, the latter enactment would prevail over the former; but it has heretofore been shown that there is no conflict between these statutes, and that the two provisions can be fully harmonized.

There is no provision contained in the fire insurance law of any state in this country in which the public interest, which means the material and moral welfare of the public, is more vitally concerned and involved than the provision heretofore quoted which is contained in the standard fire insurance policy of this state. If, therefore, instead of being accidental, the fire had been brought about by the insured by incendiarism, the crime itself would have been instigated through a false belief in the validity of the policies, which clearly concretely illustrates and demonstrates the legislative purpose in using the language contained in the statutory form, "whether valid or not."

It can readily be assumed that, when the Mutual Company in 1911 passed the resolution above set forth, its purpose

was to bring home to the members of the company the serious consequences which would result from a violation of the provisions of sec. 202.11 (3) of the Statutes, and that it had not in view a purpose antagonistic to this statutory provision, which constitutes a part of the statutory law which authorizes and sanctions its creation and existence, but that it acted with the idea in mind of effectually enforcing such statutory provision. It would clearly appear that both the statute and the resolution were enacted for the purpose of stimulating the payment of assessments. *Stutzman v. Cicero Mut. Fire Ins. Co.* 150 Wis. 254, 136 N. W. 604; *Hollister v. Quincy Mut. Fire Ins. Co.* 118 Mass. 478. There is nothing contained in the resolution which would preclude the Mutual Company, at any time before the loss, from reinstating the insured to his rights under the policy to the fullest extent, subject to compliance on his part with certain conditions. Sec. 10 of the by-laws of the company provides as follows:

"Any member of said company may withdraw therefrom at any time by giving notice in writing to the president, or, in his absence, the secretary, thereof and paying his share of all claims then existing against said company; and the directors, or a majority thereof, shall have the power to annul any policy by giving notice in writing to that effect to the holder thereof, which notice may be sent by mail."

This provision of the by-laws is also incorporated in the policy itself. Reference is herein made to said sec. 10 of the by-laws and the incorporation thereof in the policy, because it indicates very persuasively the manner and method pursuant to which a membership in the Mutual Company may be discontinued.

It is argued by plaintiff's counsel that the defendant by its acts and conduct has waived its rights to take advantage of the defense interposed, and that the defendant is estopped from claiming that the policy was suspended or that plaintiff violated any of the conditions of the policy. We are of

the opinion, however, that the provisions of the policy itself fully refute this claim as to waiver. It is there said:

"No one shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement added hereto, nor shall any such provision or condition be held to be waived unless such waiver shall be in writing added hereto, nor shall any provision or condition of this policy or any forfeiture be held to be waived by any requirement, act, or proceeding on the part of this company relating to appraisal or to any examination herein provided for; nor shall any privilege or permission affecting the insurance hereunder exist or be claimed by the insured unless granted herein or by rider added hereto."

This provision in the policy has been construed in the case of *Spohn v. National Fire Ins. Co.* 190 Wis. 446, 209 N. W. 725. In the opinion in that case it is said:

"These provisions are plain and explicit. They cover the subject of waiver and prescribe the method which must be pursued in order to effectuate a waiver. Assuming that an agent has authority to waive the conditions and provisions of a policy after it is once issued and delivered, such authority is specifically limited, and such waiver can only ensue where the provisions of the policy have been complied with. A policy of insurance is a contract between the insurer and the insured, and the provisions thereof are binding upon both parties, unless such provisions are legally waived or the contract is modified in the manner provided by the terms of the policy."

See, also, *Stillman v. North River Ins. Co.* 192 Wis. 204, 212 N. W. 67; *Welch v. Fire Association,* 120 Wis. 456, 98 N. W. 227. In the *Welch Case, supra,* the court said:

"The court has never held, in the face of a policy provision forfeiting the contract for a violation of its provisions by the assured after the issuance thereof, such provision being accompanied by a stipulation that it shall not be deemed waived other than by a writing indorsed thereon, that a waiver could take place in any other manner. The court has often held to the contrary."

See, also, *Temple v. Niagara Fire Ins. Co.* 109 Wis. 372, 85 N. W. 361; *Keith v. Royal Ins. Co.* 117 Wis. 531, 537, 94 N. W. 295.

The provisions of the policy with respect to waiver have never been complied with, and it would be a mere idle waste of time to discuss the acts and conduct of the parties which it is claimed constitute a waiver in this case, in view of the established law of the state upon that subject.

In addition to the conditions of the policy itself, there was an express non-waiver agreement. In this non-waiver agreement the plaintiff constituted the party of the first part and the defendant the party of the second part. This agreement was entered into at the time when the investigation was made by representatives of the company, in the presence and with the aid and assistance of the plaintiff and his wife. The agreement, among other things, provides as follows:

"Notice is hereby given by the party of the second part and accepted by the party of the first part, that the signer of this agreement for the party of the second part has no authority, either express or implied, to waive or invalidate any of the conditions of the policy, or waive or invalidate any of the rights whatever of, or to commit the party of the second part.

"The intent of this agreement is to preserve the rights of the parties hereto, and provide only for an investigation of the loss and claim, and the determination of the amount of the sound value and loss or damage without regard whatever to liability of the party of the second part."

Notice the language in the non-waiver agreement above quoted: "The intent of this agreement is to preserve the rights of the parties hereto." Such an investigation made pursuant to a non-waiver agreement inures to the benefit of both parties. It affords the insurance company an opportunity to make a proper investigation of the loss, and facilitates an adjustment. On the other hand, the insured may be benefited by such an investigation, because it has a tendency to save time and to avoid delay in procuring an adjustment.

The agreement is therefore a mutual agreement, from which mutual advantages are likely to spring. It is not, therefore, as the court said, a "jug-handled agreement." So that we conclude that pursuant to the provisions of the policy itself, and also the non-waiver agreement, no legal waiver of the defense herein interposed was effectuated.

The validity of a non-waiver agreement like the one herein involved is sustained in *Keet-Rountree D. G. Co. v. Mercantile Town Mut. Ins. Co.* 100 Mo. App. 504, 74 S. W. 469; *Sun Mutual Ins. Co. v. Dudley,* 65 Ark. 240, 45 S. W. 539; *Hayes v. U. S. Fire Ins. Co.* 132 N. C. 702, 44 S. E. 404; *Shawnee Fire Ins. Co. v. Knerr,* 72 Kan. 385, 83 Pac. 611.

It is further contended on the part of plaintiff's counsel, and it was so held by the court, that in putting the plaintiff to the trouble and expense it did to prove the amount of his loss and in submitting to the examination under oath, after knowing all the facts respecting the additional insurance, the defendant should be held precluded from defending on the grounds laid. The investigation was made pursuant to the non-waiver agreement and the non-waiver provision of the policy. The examination under oath was taken pursuant to the provisions of the policy. The policy provided:

"The insured, as often as may be reasonably required, shall exhibit to any person designated by this company all that remains of any property herein described, and submit to examinations under oath by any person named by this company, and subscribe the same."

The examination under oath was made shortly after the adjuster's investigation of the loss, and the plaintiff was paid for his time. The purpose of the provision in the policy authorizing an examination under oath is apparent. It furnishes reliable evidence to the company with respect to the actual loss and as to all the facts and circumstances involved in and surrounding the loss. Such an examination and in-

vestigation are contemplated by the express provisions of the statutory policy and are a part of the legislative scheme; and that being the case, it is difficult to see how, in taking advantage of such a provision so authorized by the policy, an estoppel can ensue. If under the facts and circumstances here detailed it can be held that the defendant is estopped, then the standard form of fire insurance policy would serve the purpose of a snare to entrap the insurance company into a forfeiture. Such is not the case. See *Oshkosh Match Works v. Manchester Fire Assur. Co.* 92 Wis. 510, 66 N. W. 525, and other cases cited in appellant's brief, to wit: *Ætna Ins. Co. v. Itule,* 25 Ariz. 446, 218 Pac. 990; *Connecticut Fire Ins. Co. v. George* (Okla.) 153 Pac. 116; *Shapiro v. Security Ins. Co.* 256 Mass. 358, 152 N. E. 370; *Stillman v. North River Ins. Co.* 192 Wis. 204, 212 N. W. 67.

*By the Court.*—The judgment of the lower court is reversed, and the cause is remanded with directions to dismiss the complaint.